## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JACQUELINE LEARY                                  )
8417 W 111th Terr                     )
Overland Park, KS 66210,                          )
                                                  )
        Plaintiff,           )
                                                  )
v.                                                )
                                                  )
CENTENE CORPORATION                               )
7700 Forsyth Blvd Ste 800                         )
St. Louis, MO 63105,                              )
                                                  )
CENTENE MANAGEMENT COMPANY, LLC                   )
7700 Forsyth Blvd Ste 800                         )
St. Louis, MO 63105                               )        Case No. 2:14-cv-2547
                                                  )
SUNFLOWER STATE HEALTH PLAN, INC.                 )
7700 Forsyth Blvd Ste 800                         )
St. Louis, MO 63105,                              )
                                                  )
JEAN (RUMBAUGH) WILMS                             )
7700 Forsyth Blvd Ste 800                         )
St. Louis, MO 63105 and                           )
                                                  )
ROB HITCHCOCK                                     )
7700 Forsyth Blvd Ste 800                         )
St. Louis, MO 63105,                              )
                                                  )
        Defendants.          )

## **<u>COMPLAINT</u>**

Plaintiff Jacqueline Leary ("Plaintiff"), for her Complaint against Defendants Centene

Corporation ("Centene"), Centene Management Company, LLC ("Centene Management

Company"), Sunflower State Health Plan, Inc. ("SSHP"), Jean Wilms, and Rob Hitchcock

(collectively "Defendants"), states and alleges as follows:

**PARTIES**

1.     Plaintiff is a resident of the State of Kansas.   Plaintiff was employed by Defendant Centene Management Company in her role as Vice President of Contracting and Network Development for Defendant Sunflower State Health Plan ("SSHP").

2.     Defendant Centene is a managed care provider operating in nineteen (19) states organized under the laws of the State of Delaware, with its principal place of business in the State of Missouri.   Centene is a publicly traded company as that term is defined under the Sarbanes-Oxley Act of 2002, 18 U.S.C. 1541A on the basis that it has a class of securities registered under Section 12 of the Securities Exchange Act and it is required to file reports under Section 15(d) of that Act.

3.     Defendant Centene Management Company is a wholly-owned subsidiary of Centene Corporation organized under the laws of the State of Wisconsin with its principal place of business at 7700 Forsyth Boulevard, St. Louis, Missouri.   Centene Management Company's financial information is included in the consolidated financial statements of Centene Corporation.

4.     Defendant SSHP is a wholly-owned subsidiary of Centene Corporation organized under the laws of the State of Kansas with its principal place of business in the State of Missouri.  SSHP's financial information is included in the consolidated financial statements of Centene Corporation.

5.     Defendants Jean Wilms and Rob Hitchcock are employees of Defendant Centene Management Company.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter pursuant to 18 U.S.C. § 1514A(b)(1)(B) and 28 U.S.C. §§ 1331 and 1343.

7.      Plaintiff has satisfied all private, administrative, and judicial prerequisites to the institution of this action.  A timely Complaint was filed with the Secretary of Labor on April 24, 2014.  A true and correct copy of Plaintiff's Complaint is attached hereto and incorporated by reference as Exhibit A.

8.      The United States District Court for the District of Kansas has personal jurisdiction over Defendants inasmuch as Defendant conduct business within this District.

9.      The unlawful employment practices alleged herein were committed within this jurisdiction.

## FACTS

### Privatization of Medicaid in Kansas

10.      In 2011, at the instruction and under the direction of Governor Sam Brownback, the State of Kansas undertook efforts to contract with managed care organizations to privatize the Kansas Medicaid Program.  Governor Brownback's efforts in this regard moved virtually all of the State's Medicaid enrollees into health plans run by private entities, including Defendant Centene.

11.      On November 8, 2011, the State of Kansas issued its Request for Proposal ("RFP") to obtain competitive responses from potential partners as part of these privatization efforts.   The RFP included explicit provisions to which Defendants Centene (through its subsidiary Defendant SSHP) must adhere as a contractor if its bid was accepted, including ongoing requirements that:

- SSHP must observe and comply with all federal and state laws and regulations related to the Contract (1.2.1.1).

- SSHP must maintain a network of appropriate providers supported by written agreements which is sufficient to provide adequate access to services covered under the Contract (2.2.8.2).

- SSHP must ensure that members are afforded the right to select the providers of their choice without regard to variations in reimbursement (2.2.8.5.1).

- SSHP must avoid the opportunity for or any actual practice which allows SSHP to gain any financial benefit from any policy or practice related to network recruitment, referral, reimbursement, service authorization, monitoring and oversight, or any other practice which might result in financial gain to SSHP as a result of any such policy or practice (2.2.9.1).

- SSHP must provide a state approved member handbook and other written materials with information on how to access services and notify members of program changes with at least 30 days notice.  The handbook must provide information about choosing and changing providers, procedures for written notification of the termination of a contracted provider (2.2.17, 2.2.17.1.5, 2.2.17.8.3).   SSHP must also provide enrollees with an identification of providers that are not accepting new patients, notice of any restriction on the member's freedom of choice among network providers, and notification of each member's rights and protections as specified in 42 CFR § 438.100, et seq. (2.2.17.7.1, 2.2.17.7.2, 2.2.17.7.3).

- SSHP must ensure members the right to choose among providers within the SSHP provider network (2.2.19).

- SSHP must have administrative and management arrangements or procedures and a mandatory compliance plan designed to guard against fraud and abuse which provide for written policies, procedures, and standards of conduct that articulate SSHP's commitment to comply with all applicable Federal and State standards and to maintain effective lines of communication between SSHP's compliance officer and SSHP employees (2.2.30, 2.2.30.1, 2.2.30.1.1, 2.2.30.1.4).

12.     SSHP was one of three managed care organizations selected by the State of Kansas in 2012, and the State's contract with SSHP includes additional requirements which supplemented the provisions contained in both the RFP and SSHP's response to the State's 2011 RFP.

13.     On August 6, 2012 the State of Kansas submitted a Medicaid Section 1115 demonstration proposal, entitled KanCare.  That request was approved by the Centers for Medicare & Medicaid Services on December 27, 2012, effective from January 1, 2013, through December 31, 2017.

14.     On December 7, 2012, Governor Brownback and administration officials announced that the Centers for Medicare and Medicaid Services had approved his plan to move Kansas to the managed care Medicaid system designed at his instruction.  In a press conference announcing the federal approval of KanCare, Governor Brownback described the changes as "extraordinary," and noted that "it has been tedious, and it's very important."  He explained further that "KanCare is truly what Kansas needs."

15.     The KanCare program has been plagued by difficulties reported by providers in the three managed care entities' networks since its inception on January 1, 2013.  Defendant Centene (through its subsidiary Defendant SSHP) and the two other private managed care

entities with whom the State of Kansas has contracted have also reported significant financial losses as a result of its participation in the KanCare program.  Reports generated by the Kansas Department of Health and Environment at the request of members of the Kansas Legislature's Joint Committee on Home and Community Based Services and KanCare Oversight Committee reflect that together Defendant Centene (through its subsidiary Defendant SSHP) and the two other private managed care entities with whom the State of Kansas has contracted reported losses of $110 million in 2013 and $72.6 million in the first two financial quarters in 2014.

16.     Serious concerns regarding allegations of fraud within the KanCare program have also been raised.  The 2014 Annual Report generated by the Kansas Attorney General's Medicaid Fraud and Abuse Division reflects that Defendant Centene (through its subsidiary Defendant SSHP) and the two other private managed care entities with whom the State of Kansas has contracted have failed to provide information necessary for the Division's investigations into allegations of fraud, and that these entities have provided incomplete and obscured claims data utilized for the same purposes.

**Plaintiff's Employment and its Termination**

17.     Plaintiff began her employment with Defendant SSHP as its Vice President of Contracting and Network Development in December 2012.  Both prior to and following Plaintiff's hiring, Centene's provider contracting team secured provider agreements with entities that agreed to participate in SSHP's provider network at various reimbursement rates negotiated by Centene's contract implementation team. Ms. Leary reported directly to Defendant Jean Wilms in her role as SSHP CEO, and Plaintiff's day-to-day responsibilities generally included provider contracting and provider relations.

18.     In February 2013, the first internal meeting was held between members of key executive leadership from both Centene and SSHP, including Centene Executive Vice President of Health Plans Rob Hitchcock, Centene Senior Vice President of Finance Brian Butts, SSHP CEO Jean Wilms, SSHP Vice President of Finance Terry Weathers, and SSHP Vice President of Compliance and Regulatory Affairs Virginia Picotte.  Ms. Leary was also in attendance.  At the meeting the attendees discussed SSHP's generally poor preliminary financial performance for January, and members of Centene executive leadership expressed serious concerns about SSHP's financial performance to date.  Members of Centene's executive leadership also expressed related concerns regarding the manner in which SSHP's poor financial performance would impact the financial performance for its parent Centene, especially in light of the fact that Centene had recently exited the same market in the State of Kentucky for reasons also related to financial performance for which Centene sought to blame administrators in the State of Kentucky.

19.     As part of this discussion, Defendant Rob Hitchcock asked the SSHP representatives in attendance which entities in the SSHP provider network had contracted for reimbursement rates higher than 100% of standard Kansas Medicaid rates.  When Hitchcock learned that the University of Kansas Medical Center ("KUMED") was among the entities which had contracted for higher rates of reimbursement, Hitchcock informed the others in attendance that SSHP would thereafter close its member panels in order to preclude new members from being assigned primary care physicians ("PCPs") affiliated with KUMED so that SSHP could avoid incurring expenses related to referrals by KUMED PCPs and specialists to the hospital. Hitchcock explained that these measures were necessary in order to dramatically improve SSHP's financial performance in both the short term and long term and to avoid a negative

impact to the financial performance of Centene.  Hitchcock also explained that he did not like academic centers because the medical students order too many procedures and tests.

20.     Members of SSHP executive leadership questioned the propriety of Hitchcock's directive, and suggested that SSHP should wait to take any such steps in light of the limited amount of financial data which was then available.  In response, Hitchcock said to the others in attendance, "**let me be prescriptive – you will close the PCP panels to auto assignment that are employed by the academic medical center [KUMED]**."  Following the meeting SSHP CEO Jean Wilms instructed Plaintiff to take whatever steps necessary to determine how SSHP could close the PCP panels to auto assignment as Rob Hitchcock had instructed in order to improve the financial performance of SSHP and to avoid a negative impact to the financial performance of Centene.

21.     Beginning in March 2013, Plaintiff began to communicate with various SSHP and Centene department leaders who would necessarily be involved in the closing of the PCP panels to auto assignment as she had been instructed by Ms. Wilms and Mr. Hitchcock.  During a meeting with Ms. Wilms and SSHP Vice President of Finance Terry Weathers, Ms. Leary was asked about the status of her efforts to close the PCP panels to auto assignment.  She provided details regarding her inquiries to SSHP department leaders, then explained that she believed that Mr. Hitchcock's instruction was unethical and perhaps unlawful because the providers had not requested to have the PCP panels closed to auto assignment, and because the practice contravened Centene's contractual obligations both to those providers and to the State of Kansas. In response, Ms. Wilms dismissed Ms. Leary's concerns out of hand and explained that she believed that providers at issue "[did] not want Medicaid members anyway" based upon her

experience in her previous position as Senior Director of Planning and Program Development with KUMED.

22.    In the following months, Plaintiff orchestrated the closing of the member panels for KUMED as she had been instructed against her protests to Ms. Wilms regarding the propriety of those efforts.  Ms. Leary was forced at the same time to determine how to alter the online and hard-copy provider directories to make these changes appear to somehow benign because KUMED administrators had not requested the closing of the member panels.

23.    Plaintiff was then instructed by Ms. Wilms to close the PCP panels to auto assignment for all PCPs employed by hospital systems with negotiated reimbursement rates higher than 100% of standard Kansas Medicaid rates.   Ms. Leary explained that she was uncomfortable complying with this instruction, and Ms. Wilms in response said (as Rob Hitchcock had said months before) "**let me be prescriptive – you will close their member panels to the auto assignment**."

24.    SSHP's financial performance remained troubled through the summer of 2013.  In July 2013, Ms. Wilms instructed Plaintiff to take the additional step of actually moving existing members assigned to PCPs employed by entities contracted for higher reimbursement rates to providers contracted at only 100% of standard Kansas Medicaid rates (in addition to orchestrating the selective assignment of new members).  Ms. Wilims explained later, in October 2013, that she estimated $500,000.00 in projected savings in the SSHP 2015 Annual Operating Plan for this additional effort

25.    In August 2013, Plaintiff informed Ms. Wilms that she was not willing to move members as she had instructed.  Ms. Leary asked how she could possibly explain these steps to PCPs, member service representatives, or provider representatives who inquired about the moved

members, and she insisted that she would not lie in response to such inquiries.  Neither, she said, would she instruct the staff to lie in response to inquiries of this type from inquiring providers whose panels were closed to auto-assignment or SSHP members – all for reasons related exclusively to the financial performance of SSHP and its parent, Centene.  In response, Ms. Wilms asked Ms. Leary to run a report to determine which members had actually been to see their PCP.  For those that had not yet done so, Ms. Wilms explained that she believed it would be appropriate to reassign them notwithstanding the fact that it would be done without their knowledge and without the member's request to do so.  Throughout the SSHP provider network, Ms. Wilms proposed change in this regard would have directly affected approximately 7,500 members.

26.      In September 2013, Plaintiff requested from an internal business analyst the report that Ms. Wilms sought.  The analyst explained that it would take some time to generate.  In the meantime, Ms. Wilms began a campaign of retaliation against Ms. Leary which affected the day-to-day terms and conditions of her employment.  Ms. Wilms canceled meetings with Ms. Leary, explained that there was somehow no reason for the two key SSHP executives to meet for any reason, and generally refused to interact with her in the workplace.  Ms. Wilms also authored an unfounded negative performance review in which she identified a "performance deficiency" for Plaintiff which, to her surprise, related to Ms. Leary's failure to expeditiously complete the task of moving members without their knowledge or instruction as Ms. Wilms had instructed.

27.      On January 13, 2014, Plaintiff documented in her response to her performance evaluation that she had informed Ms. Wilms  that she was not comfortable moving members as she had instructed.  The following day, Ms. Leary met with SSHP Vice President of Compliance and Regulatory Affairs Virginia Picotte to discuss Ms. Wilms's instruction to move members

without their knowledge or instruction.  She noted her serious professional objection to this directive, and explained to Ms. Picotte that she believed that the practice was contrary to both SSHP's contract with the State of Kansas and SSHP's contracts with its providers.  As part of her complaint to Ms. Picotte, Plaintiff explained also that she believed in good faith that the practice violated both the Centene Business Ethics and Conduct Policy and state or federal law, including federal anti-fraud statutes and/or federal law relating to fraud against shareholders.

28.     Ms. Picotte explained in response that she had already informed her corporate superior, Centene Director of Ethics and Compliance Brian Deutschmann, of Plaintiff's request to meet and the general issues Ms. Leary sought to discuss.  Ms. Picotte asked Ms. Leary to forward the relevant provider agreements, as Brian Deutschmann had instructed her to do, so that they could be reviewed by Centene corporate compliance representatives, along with any other information which Ms. Leary believed supported her concerns about the impropriety of the practice.  Ms. Picotte explained that it was her job as VP of Compliance to confirm if Ms. Leary's reports constituted violations of the State of Kansas KanCare contract with Defendants Centene and SSHP.  She advised Ms. Leary that it was not necessary to email the specific provisions of the State of Kansas KanCare contract with Defendants Centene and SSHP which had been violated.  During the same converation, Ms. Leary expressed her concern that she might be terminated as a result of these complaints made regarding Mr. Hitchcock and Ms. Wilms.  Ms. Picotte responded by assuring Ms. Leary that she would be protected from retaliation pursuant to Centene's Business Ethics and Conduct Policies.

29.     Ms. Picotte then explained further that she would discuss these issues with her superior, Brian Deutschmann, on Friday, January 17, and that she would thereafter respond to Ms. Leary with appropriate next steps.  The same day, Ms. Leary emailed the relevant provider

contracts, provider rosters reflecting details of the issues Ms. Leary had described, and several emails which reflected the directives from Ms. Wilms in this regard.  Ms. Picotte did not respond that day or thereafter.

30.    On January 24, Plaintiff asked Ms. Picotte about the status of the investigation of her report made 11 days before.  Ms. Picotte explained that she was waiting for Ms. Leary to send the materials she had requested, and Ms. Leary responded by explaining that she had sent the materials later the same day after their meeting.  Ms. Picotte explained in response that she had somehow not had time to investigate any of the issues identified by Ms. Leary because she had been preparing for a state audit. [1]

31.    The very same afternoon at 5:15 p.m., Plaintiff was asked to attend a meeting in Ms. Wilms's office attended also by SSHP Director of Human Resources Deb Shenkel.  At the meeting, Plaintiff's employment was terminated.  Ms. Wilms explained "I don't have the confidence that you can do your job."  Ms. Shenkel then reviewed a proposed severance agreement with Ms. Leary before she left the SSHP facility.

32.    The United States and the State of Kansas have recognized clear mandates of public policies against the perpetration of fraud in connection with the delivery of or payment for health care benefits, including those provided as part of the federal Medicaid program.

33.    18 U.S.C. Section 1347, et seq. prohibits schemes to defraud any health care benefit program or to obtain by false or fraudulent pretenses any money or property under

---

[1] Ms. Leary's complaints have already been substantiated.  Following the termination of Ms. Leary's employment, Defendant Centene conducted a purported "independent investigation" of the serious issues raised by Ms. Leary after Ms. Leary again raised these concerns in correspondence from her counsel.  Centene's "independent investigation" confirmed that primary care physicians within four separate provider groups were removed from the auto-assignment process:  (1) University of Kansas Medical Center; (2) Stormont-Vail HealthCare; (3) Saint Luke's Health System; and (4) Via Christi Health.  Each had previously negotiated reimbursement rates higher than 100% of standard Kansas Medicaid rates.

control of a health care benefit program.  The health care fraud statute is a specific derivative of the more general mail and wire fraud statutes.

34.     18 U.S.C. Section 1035 prohibits knowingly and willfully falsifying or concealing a material fact, or knowingly making a materially false writing, in connection with the delivery of or payment for health care benefits.

35.     42 C.F.R. Section 438.100 requires that enrollees must be guaranteed the right to receive information in accordance with Section 438.10, to be treated with respect and due consideration for their dignity and privacy, to receive information on available treatment options and alternatives, to participate in decisions regarding their health care, and the right to be free from an form of restraint used as a means of coercion, discipline, convenience, or retaliation.

36.     42 C.F.R. Section 438.10 sets forth certain information that must be provided to enrollees and potential enrollees, including information about the basic features of managed care and data regarding which populations are excluded from enrollment, subject to mandatory enrollment, or free to enroll voluntarily in the program.

37.     K.S.A Section 21-3844, et. seq. (the "Kansas Medicaid Fraud Control Act") prohibits schemes to defraud the Kansas Medicaid program.  The Act specifically provides in relevant part (with emphasis added):

> **Making a false claim statement, or representation to the Medicaid program is, knowingly and with intent to defraud, engaging in a pattern of making presenting, submitting, offering or causing to be made, presented, submitted or offered**:
>
> (1) Any false or fraudulent claim for payment for any goods, service, item, facility, accommodation for which payment may be made, in whole or in part, under the Medicaid program, whether or not the claim is allowed or allowable.
>
> (2) any false or fraudulent statement or representation for use in determining payments which may be made, in whole or in part, under the medicaid program, whether or not the claim is allowed or allowable;

(3) any false or fraudulent report or filing which is or may be used in computing or determining a rate of payment for any goods, service, item, facility or accommodation, for which payment may be made, in whole or in part, under the medicaid program, whether or not the claim is allowed or allowable;

(4) any false or fraudulent statement or representation made in connection with any report or filing which is or may be used in computing or determining a rate of payment for any goods, service, item, facility or accommodation for which payment may be made, in whole or in part, under the medicaid program, whether or not the claim is allowed or allowable;

(5) any statement or representation for use by another in obtaining any goods, service, item, facility or accommodation for which payment may be made, in whole or in part, under the medicaid program, knowing the statement or representation to be false, in whole or in part, by commission or omission, whether or not the claim is allowed or allowable;
…

(7) any wholly or partially false or fraudulent book, record, document, data or instrument, which is required to be kept or which is kept as documentation for any goods, service, item, facility or accommodation or of any cost or expense claimed for reimbursement for any goods, service, item, facility or accommodation for which payment is, has been, or can be sought, in whole or in part, under the medicaid program, whether or not the claim is allowed or allowable.

(8) Any wholly or partially false or fraudulent book, record, document, data or instrument to any properly identified law enforcement officer, any properly identified employee or authorized representative of the attorney general, or to any properly identified employee or agent of the department of social and rehabilitation services, or its fiscal agent, in connection with any audit or investigation involving any claim for payment or rate of payment for any goods, service, item, facility or accommodation payable, in whole or in part, under the medicaid program.;

(9) Any false or fraudulent statement or representation made, with the intent to influence any acts or decision of any official, employee or agent of a state or federal agency having regulatory or administrative authority over the Kansas medicaid program.

## COUNT ONE

### WRONGFUL DISCHARGE PROHIBITED BY SARBANES-OXLEY
### (DEFENDANTS CENTENE, CENTENE MANAGEMENT COMPANY, AND SUNFLOWER STATE HEALTH PLAN)

38.     Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

39.     Plaintiff was employed Defendant Centene Management Company.

40.     Defendant Management Company is vicariously liable for the actions of its employees and agents.

41.     Defendants Jean Wilms and Rob Hitchcock were individuals with supervisory authority over Plaintiff.

42.     The United States and the State of Kansas have recognized clear mandates of public policies against the perpetration of fraud in connection with the delivery of or payment for health care benefits, including those provided as part of the federal Medicaid program.

43.     Plaintiff engaged in protected activities or conduct by opposing the unlawful directives of Defendants Jean Wilms and Rob Hitchcock and by making a formal complaint to SSHP Vice President of Compliance and Regulatory Affairs Virginia Picotte regarding business practices which she believed in good faith violated both the Centene Business Ethics and Conduct Policy and state or federal law, including federal anti-fraud statutes and/or federal law relating to fraud against shareholders.

44.     Defendant Centene Management Company and its agents knew that Plaintiff engaged in a protected activity or conduct by opposing the unlawful directives of Defendants Jean Wilms and Rob Hitchcock and by making a formal complaint to SSHP Vice President of Compliance and Regulatory Affairs Virginia Picotte regarding business practices which she believed in good faith violated both the Centene Business Ethics and Conduct Policy and state or federal law, including federal anti-fraud statutes and/or federal law relating to fraud against shareholders.

45.     Plaintiff suffered an unfavorable personnel action when her employment was terminated on January 24, 2014.

46.    The reasons cited by Defendants for the termination of Plaintiff's employment constitute pretext for Plaintiff's wrongful termination because she engaged in lawful acts by opposing the unlawful directives of Defendants Jean Wilms and Rob Hitchcock and by making a formal complaint to SSHP Vice President of Compliance and Regulatory Affairs Virginia Picotte regarding business practices which she believed in good faith violated both the Centene Business Ethics and Conduct Policy and state or federal law, including federal anti-fraud statutes and/or federal law relating to fraud against shareholders.

47.    The circumstances as described herein, including the proximity in time between the protected activities undertaken by Plaintiff and the termination of her employment, are sufficient to raise the inference that Plaintiff's protected activities were contributing factors in Defendants' decision to terminate Plaintiff's employment.

48.    As a direct and proximate result of Defendants' actions, Plaintiff has been deprived of income and other monetary and non-monetary benefits resulting from the termination of her employment.

49.    As a further direct and proximate result of Defendants' actions, Plaintiff has suffered humiliation, emotional pain, distress, suffering, inconvenience, mental anguish, and related non-economic damages for which she is entitled from Defendants.

50.    As shown by the foregoing, Defendants' conduct was willful, wanton, and malicious, and illustrated complete indifference to or conscious disregard for the rights of others, including the rights of Plaintiff, thus justifying an award of punitive damages in an amount sufficient to punish Defendants or to deter them and other companies from like conduct in the future.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against Defendants for such damages, actual, nominal, and punitive, as are fair and reasonable, for her reinstatement with the same seniority status that she would have had but for Defendants' discrimination against her, reasonable attorneys' fees and costs incurred herein, for interest as allowed by law, and for such other and further legal and equitable relief as the Court deems just and proper.

## COUNT TWO

## WRONGFUL DISCHARGE IN VIOLATION OF KANSAS PUBLIC POLICY

### (DEFENDANTS CENTENE, CENTENE MANAGEMENT COMPANY, AND SUNFLOWER STATE HEALTH PLAN)

51.     Plaintiff hereby incorporates each preceding paragraph as though fully set forth herein.

52.     Plaintiff's opposition to the directives of Defendants Jean Wilms and Rob Hitchcock and Plaintiff's complaint to SSHP Vice President of Compliance and Regulatory Affairs Virginia Picotte regarding business practices which she believed in good faith violated both the Centene Business Ethics and Conduct Policy and state or federal law, including federal anti-fraud statutes and/or federal law relating to fraud against shareholders constitute good faith reports of serious infractions of rules, regulations, or the law pertaining to public health and safety and general welfare to company management.

53.     The United States and the State of Kansas have recognized clear mandates of public policies against the perpetration of fraud in connection with the delivery of or payment for health care benefits, including those provided as part of the federal Medicaid program.

54.     The perpetration of fraud in connection with the delivery of or payment for health care benefits, including those provided as part of the federal Medicaid program necessarily implicates recognized public policies of the State of Kansas.

55.     As such, the subject matter of Plaintiff's opposition and reports to Defendants' representatives concern a serious infraction of a clearly defined public policy of the State of Kansas.

56.     Plaintiff's reports were made in good faith based on a concern regarding the wrongful activities she reported rather than for a corrupt motive.

57.     A reasonably prudent person would have concluded that Defendants were engaged in activities that violated rules, regulations, or the law pertaining to public health and safety and the general welfare.

58.     By virtue of reports made by Plaintiff to Jean Wilms and Virginia Picotte, Defendants had knowledge that Plaintiff reported the violations prior to her discharge.

59.     Plaintiff's employment was terminated as a direct and proximate result of her reports to Jean Wilms and Virginia Picotte.

60.     Defendants' termination of Plaintiff's employment was in violation of the public policies of the State of Kansas, including but limited to those set forth herein.

61.     The reasons cited by Defendants for Plaintiff's termination are pretext for unlawful retaliation under Kansas law.

62.     As a direct and proximate result of Defendants' conduct, Plaintiff has been deprived of income, as well as other monetary and non-monetary benefits.

63.     As a further direct and proximate result of Defendants' conduct, Plaintiff has suffered a loss of self-esteem, humiliation, emotional distress and mental anguish, and related compensatory damages.

64.     As shown by the foregoing, Defendants' conduct was willful, wanton, and malicious, and illustrated complete indifference to or conscious disregard for the rights of others, including the rights of Plaintiff, thus justifying an award of punitive damages in an amount sufficient to punish Defendants or to deter them and other companies from like conduct in the future.

WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against Defendants for such damages, actual, nominal, and punitive, as are fair and reasonable, for her reasonable attorneys' fees and costs incurred herein, for interest as allowed by law, and for such other and further legal and equitable relief as the Court deems just and proper.

## COUNT THREE

### TORTIOUS INTERFERENCE WITH A
### BUSINESS RELATIONSHIP AND/OR EXPECTANCY
### (DEFENDANTS JEAN WILMS AND ROB HITCHCOCK)

65.     Plaintiff hereby incorporates each preceding paragraph as though fully set forth herein.

66.     A valid expectancy of a business relationship and/or future employment existed between Plaintiff and Defendant Centene Management Company.

67.     Defendants Jean Wilms and Rob Hitchcock, acting within the scope of their employment for Defendant Centene Management Company, had knowledge of Plaintiff's expectancy of a business relationship and/or future employment with Defendant Centene Management Company.

68.     Defendants Jean Wilms and Rob Hitchcock, acting within the scope of their employment for Defendant Centene Management Company, intentionally interfered with Plaintiff's expectancy of a business relationship and/or future employment with Defendant Centene Management Company.

69.     The actions of Defendants Jean Wilms and Rob Hitchcock resulted in the termination of Plaintiff's expectancy of a business relationship and/or employment with Defendant Centene Management Company.

70.     Defendants Jean Wilms and Rob Hitchcock, acting within the scope of their employment for Defendant Centene Management Company, lacked justification for interfering with Plaintiff's expectancy of a business relationship and/or employment with Defendant Centene Management Company.

71.     As a direct and proximate result of Defendants' actions, Plaintiff has been deprived of income and other monetary and non-monetary benefits resulting from the termination of her employment with Defendant Centene Management Company.

72.     As a further direct and proximate result of Defendants' actions, Plaintiff has suffered humiliation, emotional pain, distress, suffering, inconvenience, mental anguish, and related non-economic damages for which she is entitled from Defendants as damages.

73.     As shown by the foregoing, Defendants' conduct was willful, wanton, and malicious, and illustrated complete indifference to or conscious disregard for the rights of others, including the rights of Plaintiff, thus justifying an award of punitive damages in an amount sufficient to punish Defendants or to deter them and others from like conduct in the future.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against Defendants Jean Wilms and Rob Hitchcock for such damages, actual, nominal, and punitive, as

are fair and reasonable, for her reasonable attorneys' fees and costs incurred herein, for interest as allowed by law, and for such other and further legal and equitable relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which she has a right to trial by jury.

## DESIGNATED TRIAL LOCATION

Pursuant to D. Kan. Rule 40.2, Plaintiff hereby designates the place of trial as **Kansas City, Kansas**.

Respectfully submitted,



/s/ Lewis M. Galloway
Lewis Galloway        Kansas Bar No. 20172
1600 Genessee St, Suite 918
Kansas City, MO 64102
Phone: (816) 442-7002
Fax:    (816) 326-0820
lewis@lglawllc.com

ATTORNEY FOR PLAINTIFF