## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Jacqueline Leary,**

      **Plaintiff/Counterclaim Defendant,**

**v.**                              **Case No. 14-CV-2547**

**Centene Corporation;**
**Centene Management Company, LLC;**
**Sunflower State Health Plan, Inc.;**
**Jean Rumbaugh Wilms; and Rob Hitchcock,**

      **Defendants/Counterclaimants.**


## MEMORANDUM & ORDER

Plaintiff Jacqueline Leary was employed by defendant Centene Management Company, LLC as Vice President of Contracting and Network Development for defendant Sunflower State Health Plan, Inc. ("SSHP"). According to the complaint, both Centene Management Company and SSHP are wholly-owned subsidiaries of defendant Centene Corporation, a managed care provider. Defendants Jean Wilms and Rob Hitchcock are also employees of defendant Centene Management Company. In her complaint, plaintiff alleges a claim against the three corporate defendants under the whistleblower protection provision of Sarbanes-Oxley, 18 U.S.C. § 1514A(a), as well as a state law claim for wrongful discharge in violation of Kansas public policy. She asserts a state law claim under Kansas law for tortious interference with a business relationship and/or expectancy against the individual defendants.

In their answers to plaintiff's complaint, each of the corporate defendants has asserted state law counterclaims against plaintiff for abuse of process and defamation. This matter is now before the court on plaintiff's motion to dismiss defendants' counterclaims (doc. 14). As will be explained, the court grants the motion with respect to defendants' counterclaims for abuse of process and denies the motion with respect to defendants' counterclaims for defamation.[1]

**Background**

According to the parties' pleadings, the State of Kansas in 2011 began efforts to move virtually all of the State's Medicaid enrollees into health plans run by private entities. Toward that end, the State issued a Request for Proposal to obtain responses from potential partners as part of these privatization efforts. Defendant Centene Corporation, through its subsidiary SSHP responded to the RFP and was one of three managed care organizations selected by the State of Kansas in 2012. In August 2012, the State of Kansas submitted a Medicaid Section 1115 demonstration proposal entitled KanCare. That request was approved by the Centers for Medicare & Medicaid Services in late December 2012, effective from January 1, 2013 through December 31, 2017. Plaintiff asserts that the KanCare program has been "plagued by difficulties" reported by providers in the three managed care entities' networks since its inception in January 2013. According to plaintiff, defendant Centene Corporation and the two

---

[1] Because each corporate defendant has filed a separate answer to plaintiff's complaint, plaintiff essentially is moving to dismiss three abuse-of-process counterclaims and three defamation counterclaims.

other private managed care entities with whom the State of Kansas contracted have reported significant financial losses as a result of their participation in the KanCare program.

Plaintiff began her employment with defendant Centene Management Company, LLC in December 2012 as defendant SSHP's Vice President of Contracting and Network Development. Plaintiff's provider contracting team was responsible for securing provider agreements with entities that agreed to participate in SSHP's provider network at various reimbursement rates negotiated by Centene's contract implementation team.   Plaintiff reported directly to Jean Wilms, SSHP's Chief Executive Officer.   In February 2013, plaintiff attended an internal meeting of upper management during which SSHP's poor preliminary financial performance was discussed and members of Centene's executive leadership allegedly expressed serious concerns about SSHP's financial performance and the manner in which that poor financial performance would impact the financial performance of its parent, Centene.   Plaintiff alleges that during this discussion, defendant Rob Hitchcock, Centene's Executive Vice President of Health Plans, asked the SSHP representatives in attendance which entities in the SSHP provider network had contracted for reimbursement rates higher than 100% of standard Kansas Medicaid rates.   According to plaintiff, when Mr. Hitchcock learned that the University of Kansas Medical Center ("KUMED") was among the entities which had contracted for higher rates of reimbursement, Mr. Hitchcock informed the attendees that SSHP would thereafter close its member panels in order to preclude new members from being assigned primary care physicians (PCPs) affiliated with KUMED so that SSHP could avoid incurring expenses related to referrals by KUMED PCPs and specialists to the hospital.   Plaintiff alleges that Mr. Hitchcock asserted that such measures were necessary in order to dramatically improve SSHP's financial

performance.  According to plaintiff, Ms. Wilms, following the meeting, instructed plaintiff to take whatever steps were necessary to determine how SSHP could close the PCP panels to auto assignment.

Plaintiff contends that when Ms. Wilms inquired in March 2013 about the status of her efforts to close the PCP panels to auto assignment, plaintiff explained that she believe that Mr. Hitchcock's instruction was unethical and perhaps unlawful because the providers had not requested to have the PCP panels closed to auto assignment and because the practice violated Centene's contractual obligations both to those providers and to the State of Kansas.  Plaintiff alleges that Ms. Wilms dismissed her concerns and asserted that the providers at issue "did not want Medicaid patients anyway."   In the following months, plaintiff contends that she orchestrated the closing of the member panels for KUMED and that Ms. Wilms ultimately instructed her to close the PCP panels to auto assignment for all PCPs employed by hospital systems with negotiated reimbursement rates higher than 100% of standard Kansas Medicaid rates.

According to plaintiff, in July 2013 Ms. Wilms instructed plaintiff to take the additional step of moving existing members assigned to PCPs employed by entities contracted for higher reimbursement rates to providers contracted at only 100% of standard Kansas Medicaid rates.  Plaintiff alleges that she told Ms. Wilms that she was not willing to do so.  At that point, plaintiff alleges that Ms. Wilms began a campaign of retaliation against her.  Eventually, on January 13, 2014, plaintiff met with Virginia Picotte, SSHP's Vice President of Compliance and Regulatory Affairs.   Plaintiff alleges that she advised Ms. Picotte about her concerns with the instructions of Mr. Hitchcock and Ms. Wilms and her belief that SSHP's practices violated

4

Centene's ethics policy, state and/or federal law, and SSHP's contractual obligations with the State and with its providers. Plaintiff contends that Ms. Picotte never followed up on plaintiff's concerns and that plaintiff reached out to Ms. Picotte again on January 24, 2014 to inquire about the status of an investigation into plaintiff's concerns. According to plaintiff, plaintiff's employment was terminated that same afternoon.

The corporate defendants, in their counterclaims, assert that plaintiff, in February 2014, made a pre-suit settlement demand of $3 million which defendants contend was an outrageous and extortive amount. Defendants contend that they refused the demand and that plaintiff subsequently filed her lawsuit "not to recover on the cause of action stated in the Complaint, but in furtherance of" plaintiff's "extortive scheme." Defendants, on this basis, assert a counterclaim for abuse of process. Defendants further assert a counterclaim for defamation based on allegedly defamatory remarks that plaintiff made after her termination to Todd Lutz, the Director of Managed Care for Stormont Vail Hospital. Defendants contend that plaintiff told Mr. Lutz that defendants terminated her employment as a result of her contacting the compliance department; that defendants directed her to do something inappropriate during her employment; and that defendant SSHP engaged in unethical or unlawful business practices.

**Abuse of Process**

Defendants have asserted a counterclaim against plaintiff for abuse of process. Abuse of process exists when the defendant (or, of course, counterclaim defendant) "uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed." *Hokanson v. Lichtor*, 5 Kan. App. 2d 802, 809 (1981) (quoting *Restatement*

*(Second) of Torts* § 682 (1977)).  In Kansas, the elements of an abuse of process claim are as follows: (1) that the defendant made an illegal, improper, perverted use of the process, (a use neither warranted nor authorized by the process); (2) that the defendant had an ulterior motive or purpose in doing so; and (3) that damage resulted to the plaintiff from the irregularity.  *Porter v. Stormont–Vail Hosp.*, 228 Kan. 641, 646 (1980) (citations and quotations omitted).  As explained in the Restatement,

> For abuse of process to occur there must be use of the process for an immediate purpose other than that for which it was designed and intended.  The usual case of abuse of process is one of some form of extortion, using the process to put pressure upon the other to compel him to pay a different debt or to take some other action or refrain from it.

Restatement (Second) of Torts 682 cmt. b (1977).  The "gravamen of the tort is not the wrongfulness of the prosecution, but some extortionate perversion of lawfully initiated process to illegitimate ends."  *Heck v. Humphrey*, 512 U.S. 477, 486 n.5 (1994).

Plaintiff moves to dismiss the abuse-of-process counterclaims under Rule 12(b)(6) on the grounds that defendants have failed to state a claim for abuse of process.  For purposes of plaintiff's motion, then, the court accepts as true "all well-pleaded factual allegations in the [counterclaim] and view[s] them in the light most favorable to the [counterclaim] plaintiff." *Burnett v. Mortgage Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013) (citation omitted).  "To survive a motion to dismiss, a [counterclaim] must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))).  Assuming the truth of the allegations in defendants' counterclaims, they have failed to state viable claims for relief for abuse of process under Kansas law.

In their counterclaims, defendants allege that plaintiff sought to extort $3,000,000 from them prior to the filing of her lawsuit; that plaintiff's demand was not commensurate with plaintiff's damages; that plaintiff threatened to report defendants' conduct to the State of Kansas if they did not meet her demand; that defendants "refused to be extorted;" and that plaintiff thereafter filed this lawsuit not to recover on the causes of action stated in her complaint but in furtherance of plaintiff's "extortive scheme" for the purpose of harassing and causing hardship to defendants. As described by defendants, their counterclaims for abuse of process are based on plaintiff's filing of the lawsuit against them with ulterior motives—to extort a large sum of money and to harass defendants. But the mere filing or maintenance of a lawsuit, even for an improper purpose, is not a proper basis for an abuse of process action; abuse of process contemplates some overt act done in addition to the initiating of the suit. *See Lindeman v. Umscheid*, 255 Kan. 610, 621 (Kan. 1994) (abuse-of-process claim must include an "improper act" in the regular prosecution of a proceeding); *Tappen v. Ager*, 599 F.2d 376, 379-80 (10th Cir. 1979) (abuse of process under Kansas law requires a "willful act in the use of the process, one not proper in the course of the regular conduct of the proceeding").

The counterclaim defendants have not alleged any overt or willful act outside the course of the legal proceedings in this case. Plaintiff's pre-suit settlement demand is within the four corners of the litigation; indeed, the objective to obtain damages is the "object of every lawsuit, and . . . it cannot distinguish the abuse of process action." *Tappen*, 599 F.2d at 380. Even if an abusive settlement demand could satisfy the willful act requirement, plaintiff's demand in this case was not so unreasonable as to fall outside the legal process where her prayer for relief includes claims for economic, emotional distress and punitive damages. *See Rusakiewicz v.*

7

*Lowe*, 556 F.3d 1095, 1103-05 (10th Cir. 2009) (affirming dismissal of abuse-of-process claim under Utah law because settlement demand is part of, and not outside of, regular conduct of legal process).[2]   Because defendants have alleged only that plaintiff initiated her lawsuit to coerce a settlement of the very claims set forth in the lawsuit (as opposed to a collateral matter), they cannot recover for abuse of process.   *Tappen*, 599 F.2d at 380 (no abuse of process claim even if action is instituted solely to coerce a settlement).   Plaintiff's motion to dismiss defendants' counterclaims for abuse of process is granted.

**Defamation**

In addition to their counterclaims for abuse of process, defendants have alleged counterclaims for defamation.  Plaintiff moves to dismiss these counterclaims on the grounds that the court lacks subject matter jurisdiction over those claims.  The supplemental-jurisdiction statute provides that a federal court with original jurisdiction over one claim (such as plaintiff's Sarbanes-Oxley claim) may exercise "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  "A claim is part of the same case or controversy if it derives from a common nucleus of operative fact."  *Price v. Wolford*, 608 F.3d 698, 702–03 (10th Cir. 2010).  While plaintiff contends that defendants' defamation counterclaims do not share with plaintiff's claims a common nucleus of operative fact, the court finds that the supplemental jurisdiction standard is

---

[2] While the Tenth Circuit in *Rusakiewicz* applied Utah law to the abuse-of-process claim, the court discerns no difference between Utah law and Kansas law with respect to that claim.

satisfied here because defendants' claims for defamation are based, at least in part, on the same factual allegations asserted by plaintiff in support of her claims for relief.[3]

In support of their defamation claims against plaintiff, defendants allege that plaintiff, after the termination of her employment, communicated with Todd Lutz, the Director of Managed Care for Stormont Vail Hospital.  According to defendants, plaintiff advised Mr. Lutz that defendants had directed her to do "something inappropriate" during her employment and that her employment had been terminated as a result of her contacting defendants' compliance department.  Defendants further allege that plaintiff has communicated to other third parties that she was terminated as a result of contacting the compliance department and that defendants engaged in unethical or unlawful business practices.   Defendants contend that these communications were false and defamatory and that defendants suffered harm to their reputation as a result of plaintiff's communications.

Even though plaintiff's allegedly defamatory statements were made after the end of her employment relationship with defendants, those statements are nonetheless sufficiently tied to her Sarbanes-Oxley claim to satisfy § 1367(a).   To prove her Sarbanes-Oxley claim, plaintiff will need to demonstrate that her contacting the compliance department contributed to the termination decision.  *See Lockheed Martin Corp. v. Administrative Review Board*, 717 F.3d 1121, 1136 (10th Cir. 2013).  To prove their defamation claims, defendants will need to

---

[3] In the alternative, plaintiff urges that even if supplemental jurisdiction is proper under § 1367(a), the court should nonetheless decline to exercise supplemental jurisdiction because defendants have asserted those counterclaims in retaliation for plaintiff's assertion of her lawful rights—an improper motive that constitutes an "exceptional circumstance" sufficient for the court to decline jurisdiction under § 1367(c).  The court does not believe that exceptional circumstances exist here and, to the contrary, believes that exercising supplemental jurisdiction would further the interests of economy and convenience.

9

demonstrate that plaintiff's statement about the reasons for her termination was false—that, in fact, she was not terminated for contacting the compliance department.   *Hall v. Kansas Farm Bureau*, 274 Kan. 263, 276 (2002).   Both claims will also require evidence as to whether defendants engaged in unethical or unlawful business practices and whether plaintiff reasonably believed that they did so.   Clearly, then, these claims arise out of the same facts and the evidence underlying both claims will overlap.   The motion to dismiss is denied.   *See Deman Data Systems, LLC v. Schessel*, 2014 WL 408443, at *7 (M.D. Fla. Feb. 3, 2014) (defamation counterclaim arose out of common nucleus of operative fact with federal claim where both claims arose out of the employment relationship and alleged defamatory statements related to purported reason for employment termination); *Khouri v. Yuma Gastroenterology, P.C.*, 2007 WL 1215021, at *2-3 (D. Ariz. Apr. 23, 2007) (plaintiff's claim for wrongful discharge shared common nucleus of operative fact with employer's defamation counterclaim).

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff's motion to dismiss counterclaims (doc. 14) is granted in part and denied in part.

**IT IS SO ORDERED.**

Dated this 10th day of March, 2015, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

10